## LORENZO EGGLESTON v. JACOB K. WAGNER.

*Contract for sale of lands—Extension of time—Sufficiency of description— Acceptance.*

An extension of time, in a proposal to sell, stands by itself, and is not the same as the contract of sale which is completed only by an acceptance of the proposal.

Where a party verbally directs his name to be attached to a contract, and it is done under his personal supervision, he is bound as if by his own signature.

The description of real property, in a contract for its sale, must so fit and comprehend it that it can be applied to the property intended and exclude all else, with the aid, at least, of extrinsic testimony which shall neither contradict nor add to it; and a conflict in the extrinsic evidence cannot establish its insufficiency under the Statute of Frauds.

The sufficiency, under the Statute of Frauds, of a description of land in a contract for its sale, is a question which arises on the face of the papers, and, *it seems*, should be settled by inspection thereof before the introduction of extrinsic evidence to connect the contract with any particular premises.

The existence of a contract is a question independent of circumstances that may excuse its performance.

There is no acceptance where a proposal to grant one thing is answered by an offer to close the matter and take another; or, when the proposal involves executory proceedings on each side, and the person to whom it is made couples with this acceptance conditions that essentially change the offer or materially vary its effect.

An offer and acceptance cannot of themselves constitute a contract unless the acceptance is absolute and unconditional, complies with the conditions of the proposal, and includes whatever undertaking, right or interest the proposal calls for; nor unless they correspond in regard to subject matter and the extent of the interest to be transferred.

One partner offered to sell out to another for a specified sum but afterwards bought out the other instead, though he gave him, at the same time, an extension of the offer to a fixed date. Meanwhile the business was carried on, old debts were paid and new ones contracted, and substantial changes occurred. *Held* that a tender, at the end of the time limited, of the amount stated in the offer, in payment for the interest then held by the partner who had made it, was not such an acceptance of the offer as would create a contract relation, as it amounted to a proposal to take more than was offered

Error to Kalamazoo. Submitted June 17. Decided Oct. 12.

ASSUMPSIT. ˙Defendant brings error.    Reversed.

*Severens, Tryon & Ranney* and *Dallas Boudeman* for
plaintiff in error.    A contract for the sale of lands must be
complete enough to identify the property either by descrip-
tion, or by reference to some other writing that does describe
it, and without parol evidence: *Clark v. Chamberlin* 112
Mass. 19 ; *Wright v. Weeks* 25 N. Y. 161 ; *Jordan v. Fay* 40
Me. 130 ; *Sheid v. Stamps* 2 Sneed 172 ; *Farwell v. Mather*
10 Allen 322 ; *Hagan v. Domestic S. M. Co.* 9 Hun 74 ;
*King v. Wood* 7 Mo. 389 ; *Snyder v. Neefus* 53 Barb.
63 ; *Parkhurst v. Van Cortlandt* 1 Johns. Ch. 273 ;
*Rollin v. Pickett* 2 Hill 553 ; *McGuire v. Stevens* 42
Miss. 724 ; *Holmes v. Evans* 48 Miss. 247 ; *Blagden v. Brad-
bear* 12 Ves. 466 ; *Abeel v. Radcliff* 13 Johns. 297 ; *John-
son v. Granger* 51 Tex. 42 ; *Barickman v. Kuykendall* 6
Blackf. 21 ; *Taney v. Bachtell* 9 Gill 210 ; *Dorsey v. Wayman*
6 Gill 65 ; 1 Greenl. Ev. § 268 ; 2 Kent's Com. 571 ; *Hall
v. Soule* 11 Mich. 494 ; *Huntington v. Wellington* 12 Mich.
10 ; *James v. Muir* 33 Mich. 223 ; *McElroy v. Buck* 35 id.
434 ; land contracts must be signed by the parties or by some
one authorized in writing: Comp. L. § 4694 ; *Hyde v. Cooper*
13 Rich. Eq. 250 ; Browne Stat. Frauds §§ 10–12.

*O. W. Powers* and *M. J. Smiley* for defendant in error.
An offer, together with the acceptance if made before it is
withdrawn, constitute a contract, and the acceptance is suffi-
cient consideration: *People v. Taylor* 2 Mich. 250 ; *Thrus-
ton v. Thornton* 1 Cush. 91 ; *Kennaway v. Treleavan* 5 M. &
W. 498 ; Chit. Cont. (3 Am. ed.) 78 ; 1 Pars. Cont. 449, 482 ;
the description in a contract is sufficient if the property can
be identified, and the subject matter may be shown by parol :
Browne St. Frauds˙ § 385 ; *Atwood v. Cobb* 16 Pick. 230 ;
*Blake v. Doherty* 5 Wh. 359 ; *Tallman v. Franklin* 14
N. Y. 584.

GRAVES, J.    Wagner brought this action to recover dam-
ages on account of Eggleston's alleged failure to convey his

interest in certain real and personal property in pursuance, as claimed, of a contract therefor between the parties.

The case was brought to trial last February before a jury in the circuit court for the county of Kalamazoo and under the rulings on points of law a verdict was given in favor of Wagner for $9000. Several objections were taken on the part of Eggleston during the trial and he asks a re-examination on writ of error and bill of exceptions of a portion of them.

Before touching any of the questions of law some preparatory reference is expedient to certain facts and circumstances immediate and surrounding and many of which are not disputed. The parties in the latter part of the year 1878 formed a partnership at Kalamazoo for the purpose of carrying on what is called in the record the " Kalamazoo Spring & Axle Works." The style of the firm was " Eggleston, Wagner & Co.," but the seat of business together with the enterprise were distinguished by the trade-name of the " Kalamazoo Spring & Axle Works." A considerable amount of real and personal property was invested, but the capital put in by Wagner was somewhat less than what Eggleston furnished. The business soon expanded into pretty large proportions and turned out profitable. The parties were also partners in a business at Mishawaka in Indiana. May 19, 1879, Eggleston delivered to Wagner the following proposition in writing :

" KALAMAZOO SPRING & AXLE WORKS.
*Office of Eggleston, Wagner & Co.*
L. EGGLESTON,                    (Established 1870.)
J. K. WAGNER.        KALAMAZOO, MICH., May 19, 1879.
Office and Works on Portage Street.

*Mr. J. K. Wagner :* SIR—I will sell you my entire rights, title and interest in the lands, buildings, stock, cash and accounts, and all assets whatever, belonging to the business of the Kalamazoo Spring & Axle Works, or standing in my name, and bought for the use of said business, for the sum of forty-two thousand dollars ($42,000)—*I will say forty thousand.* Provided, that you shall assume all liabili-

ties and all warrants, orders, contracts, and guarantees made in the name of Eggleston, Wagner & Co., and all liabilities made in my name and for the use of said business.

LORENZO EGGLESTON. T."

This paper with the exception of the paragraph "I will say forty thousand," was in ink and was written at Eggleston's personal dictation and in his presence by Mr. Tuthill, a clerk of the firm. The excepted passage was interlined in pencil by Mr. Eggleston. At this time and during the succeeding forty-two days or up to July 1st, the subject-matter referred to in this paper was variable. The parties kept the business going, and considerable changes were necessarily incident to any progress in it.

June 9, 1879, it was mutually agreed that Wagner should retire from the firm, he being paid by Eggleston the money he had put in with interest at eight per cent., his salary $125 per month, and so much of the assets of the Mishawaka business as had been collected. The amount was then figured up by McCamly, a clerk of the firm, and he swears that the amount on the account of the business at Mishawaka was $323.12, and that to be paid on account of "spring business with interest and salary and Mishawaka business" made a total of $13,426.65 and that this sum was immediately paid by check.

Wagner admits that this "composed his whole interest in the business here" (at Kalamazoo) "and so much of the Mishawaka business as had then been collected in."

On the same day, McCamly, by Eggleston's personal direction and in his presence, endorsed on the paper of May 19th the following writing: "This offer is hereby confirmed and extended until July 1st, 1879. Business hereafter transacted to be upon this basis. Kalamazoo, Mich., June 9, 1879. L. EGGLESTON, per M." In regard to the actual circumstances under which this endorsement originated the evidence is discordant. Wagner swears that it formed a part of the agreement for his retirement and the relinquishment of his interest to Eggleston and was a part of the consideration he, Wagner, exacted. Eggleston and

McCamly, however, testify that it was a distinct transaction. Their explanations are materially different.

Wagner testifies that Eggleston informed him on the 6th of June that if he would withdraw the money he had in the firm and eight per cent. interest and $125 per month, that he would extend the time to July 1st, and would sell his interest in the business for $40,000. That the subject was renewed on the 9th of June and that he, Wagner, then inquired of Eggleston if he would include in his proposition a settlement of the Mishawaka business so far as the assets had been collected, to which he replied affirmatively, and that the extension was made in the same interview and before he, Wagner, left the office, and that the paragraph in pencil was still in the original paper.

Eggleston testifies that up to the time of ascertaining and deciding on June 9th what sum was to be paid to Wagner for going out, nothing had been said about extending the time in case he would take out his money. That the subject was not mentioned until Wagner had received his check and had started to go out of the room. That he, Eggleston, then said he was sorry it had turned out as it had as he was in hopes Wagner would take the property, and asked him if it would do any good to extend the time. That Wagner replied that he did not know as it would as he had tried about everybody to get the money, and he asked if he, Eggleston, would make the price any less, to which the latter said he would not, but if Wagner would pay him $42,000 by July 1st he might have it. That Wagner went away and some time afterwards returned, but on the same day, and inquired of Eggleston if he would put that agreement on the back of the contract; to which the latter replied that he would, and immediately dictated to McCamly the matter contained in the endorsement. That he, Eggleston, did not himself sign it and that McCamly had no authority in writing to sign his name.

When produced on the trial the paper of the 19th of May had undergone some alteration. The paragraph in pencil

had been rubbed out and the statement in ink of the sum to be paid had been reduced from $42,000 to $40,000.

·Wagner testifies that Eggleston made the change on June 27th at his request, and that he explained the object to be to remove a seeming ambiguity.

Eggleston swears that some time after the 9th of June Wagner called and asked him if he would not make the price $40,000. and he refused, and that Wagner then requested him to rub off the pencil marks as it was rather ambiguous as it was ; and he thereupon " rubbed it off partially and then Mr. Wagner took the rubber and rubbed it some more." That no change was made at that time in the amount specified in ink, and that the alteration from 42,000 to 40,000 in that part of the paper set down in ink was not done by him, Eggleston, or in his presence or by any one with his authority.

The testimony of McCamly tends to corroborate Eggleston in regard to these disputed matters. But under the charge given by the court it is to be inferred that the jury gave credence to Wagner's version.

June 30, 1879, Wagner called on Eggleston at his office and informed him that he "had come there with $40,000 in greenbacks to close up the trade" and produced the money and offered to count it but Eggleston waived it. At the same time Wagner produced a blank bill of sale from Eggleston to himself ready to be executed and delivered and three full covenant deeds running to himself from Eggleston and wife and ready to be executed, acknowledged and delivered. He held also and offered to execute and deliver his personal covenant to Eggleston assuming and agreeing to pay "all liabilities and all warrants, orders, contracts and guarantees made in the name of Eggleston, Wagner & Co. and all lia-. bilities made in the name of said party for the use of said business of said Eggleston, Wagner & Co." All the papers bore date June 30, 1879. The deeds covered three separate parcels of land, one containing the shop buildings, and being on Portage street, north-west of the portage, the second not far distant on Jasper street, and the third further

south and being on Portage street. There being no diagram, the want of uniformity in the references to these lands in the testimony prevents any separate tracing of them throughout the record.

The specified consideration in the respective deeds was $40,000, $1800 and $1500; that is to say, each deed contained one of these sums as the consideration. The bill of sale expressed $40,000 as the consideration and purported to transfer to Wagner "all and singular all rights, titles and interest in and to the lands, buildings, stock, cash, (in hand and in bonds) and all accounts, notes and drafts on hand or in course of collection, also my undivided one-half interest in and to the patent for the H. J. Gage bolster spring, and all *choses in action* and assets whatever belonging to the business of the Kalamazoo Spring & Axle Works, (Eggleston, Wagner & Co., proprietors,) or standing in my name and bought for the use of said business, and also all machinery, tools, coal, wood and each and every article used in and about the Kalamazoo Spring Works." A covenant to warrant and defend against all persons was inserted.

Wagner testifies that he displayed the money and these papers and told Eggleston he "wanted to close up the matter." That he handed the deeds to Eggleston who took them and laid them on the table and observed that "if there was only $40,000 we could not buy it,—could not do anything. It will take $60,000, certainly, nothing less." Wagner proceeds to explain what followed in these terms:

"I said what shall we do? This is the last day. I came here with the money expecting to close it up. Eggleston said he did not expect to do anything; said he, you must bring $60,000; I don't want any sharp business. I asked him whether he refused it or not. He said he did not refuse it, neither did he accept it. This he repeated several times, and he said that he did not want to be caught in the matter; and I told him that I did not intend to play sharp. I insisted to know what he wanted to do, and he said, I want the debts paid, and I said I will assume them by signing that paper; and he said that isn't paying them. Eggleston said he shouldn't sign any papers. I offered expressly to sign the paper assuming all liabilities of the concern.

He said, Wagner, bring $60,000 and I think we can trade. I asked him if he wasn't going to accept the paper, and he said no, he couldn't do it, but if I would bring $60,000 we might trade. He said he would not sign the deeds. I offered to sign this paper to assume the debts."

The evidence of Mr. Wykoff who went with Wagner, is substantially to the same effect. Eggleston relates what occurred in this way:

"When they came in Wykoff said something like this: 'Here is your filthy lucre;' and they laid a bundle done up in a lap-robe on the table and Wagner said it was $40,000 and wanted me to count it, and I said it did not make much difference if it was $40,000 or $6,000. I said if they would add $20,000 to $25,000 we could probably fix it up. Wykoff said to Wagner, 'I thought this fixed it all up,' and I said it would take more than that. Wagner then produced some papers which he said were deeds, and I did not look at the deeds or papers, but said I did not want to sign them until we fixed up the other matters. Wagner said, 'I will assume them,' and I said, 'assuming them and paying them are two different things. I shan't refuse to sign the deeds when you come with money enough.' I told Wagner that since we had had the talk before, I had paid Stockbridge, Eggleston & Co. considerable on a liability to them, and that he, Wagner, must pay back the $13,000 which I had paid him when we settled. I had paid Stockbridge, Eggleston & Co. some $11,000 after the extension was made. He asked me how much of the liability had been paid, and I told him I couldn't tell without looking over the books, but if he would come down in the morning we would look them over. He was there about ten minutes."

It will be acknowledged that the papers of May 19th and June 9th, assuming that they emanated from Eggleston, amounted to nothing more than a proposal to sell and that if any contract of sale was ever perfected on their basis it was not until June 30th. It may be, and Wagner's evidence tends that way, that on June 9th the parties did contract that the existing proposal should not be withdrawn prior to July 1st and that Wagner's option might continue until that time. But if such was the fact it was a separate matter and subject to its own incidents and not the contract of purchase to arise on an acceptance of the proposal and which

could be made only by such acceptance, and not by a continuance, or agreement to continue the proposal. The ground on which the action is laid is that by putting together the papers of May 19th and June 9th and Wagner's proceedings on June 30th in relation thereto, a contract of sale was immediately concluded between the parties, and that Eggleston by his conduct on the same occasion committed a breach of it.

The point first noticeable relates to Eggleston's connection with the writings of May 19th and June 9th. It is objected that he did not himself sign either of them; and that although they were in fact signed in his name and in his presence and by his order, yet as the authority of the person who performed the manual act of writing the name was only by parol and not in writing, the signature was not that of defendant in point of law and was not binding, and 2 Comp. L. § 4694 is cited. This position stands positively refuted by decisions of this court. *Just v. Wise* 42 Mich. 573; *Johnson v. Van Velsor* 43 Mich. 208–218.

It is true that the mechanical act of signing was the act of another; but it is equally true that it was the immediate dictate of the will of Eggleston and was performed under his actual personal supervision. The penman was as much his instrument in respect to the fact of signing as the pen itself would have been had he actually held it. The signature was substantially his own.

A further objection is that the proposal did not sufficiently describe the real estate to satisfy the statute of frauds. The general principle is not questioned. The degree of certainty with which the premises must be denoted is defined in many books, and the cases are extremely numerous in which the subject has been illustrated. They are not all harmonious. But they agree in this, that it is not essential that the description have such particulars and tokens of identification as to render a resort to extrinsic aid entirely needless when the writing comes to be applied to the subject-matter. The terms may be abstract and of a general nature; but they must be sufficient to fit and comprehend

the property which is the subject of the transaction; so that with the assistance of external evidence, the description, without being contradicted or added to, can be connected with and applied to the very property intended and to the exclusion of all other property.

The circumstance that in any case a conflict arises in the outside evidence cannot be allowed the force of proof that the written description is in itself insufficient to satisfy the statute. Whether the description answers the requirement of the statute is a question which occurs on the face of the papers and is naturally preliminary to the introduction of testimony to connect the contract with the property, and the decision of it would regularly seem to be required on an inspection of the documents and before the arrival of opportunity for any conflict of the kind referred to. Moreover, it would hardly be deemed reasonable to allow the validity of the written description to depend on the ability of a party to bring about a conflict in the outside testimony. In my judgment the proposal was not open to this objection. A few cases are cited as examples of the view which other courts have taken of the subject: *Tallman v. Franklin* 14 N. Y. 584; *Hurley v. Brown* 98 Mass. 545; *Scanlan v. Geddes* 112 Mass. 15; *Mead v. Parker* 115 Mass. 413; *Slater v. Smith* 117 Mass. 96; *White v. Hermann* 51 Ill. 243; *Nichols v. Johnson* 10 Conn. 192; *Colerick v. Hooper* 3 Ind. 316; *Waring v. Ayres* 40 N. Y. 357; *King v. Ruckman* 20 N. J. Eq. 316; *Ogilvie v. Foljambe* 3 Meriv. 53-60; *Bleakley v. Smith* 11 Sim. 150; *Owen v. Thomas* 3 Myl. & K. 353; *White v. Bradshaw* 13 E. L. & E. 296: 16 Jurist 738; *Stuart v. London & N. W. Ry. Co.* 10 E. L. & E. 57; *Commins v. Scott* L. R. 20 Eq. Cas. 11: 13 Eng. 576; *Barry v. Coombe* 1 Pet. 640; *Dobson v. Litton* 5 Coldw. 616.

Thus far the case is with the defendant in error. But a more formidable objection is now reached and it involves a question which is independent of the point just considered. The case does not distinguish it in a very clear way, but the exceptions cover it and an opinion upon it is necessary. The question is whether on the facts stated by Wagner and

not controverted by Eggleston a contract of sale was actually constituted; or in other words whether the acts of Wagner on June 30th were in any such sense responsive to the offer from Eggleston as to bring the parties into the alleged contract relation. The existence of a contract is a question independent of circumstances which may excuse its performance, and as no contract could come into existence without an agreement of minds it becomes a vital consideration whether the proposal made by Eggleston and the acts of Wagner relied on as acceptance had reference to the same thing or things in the same sense. If in answer to a proposal to grant Black Acre a person replies that he is ready to close the matter and will take White Acre there is no acceptance. Neither is there an acceptance where executory proceedings on each side are involved in the proposal and the party professing to accept introduces a variance and formulates his adoption of the offer with conditions and qualifications which essentially alter some of the constituents or materially vary the effect. In such cases no contract is brought into existence. *Kyle v. Kavanagh* 103 Mass. 356; *Suydam v. Clark* 2 Sandf. 133; *Nat. Bank v. Hall* 101 U. S. 43; *Jordan v. Norton* 4 Mees. & W. 155; *Hussey v. Horne-Payne* 8 Ch. Div. 670; 25 Eng. 561; *Tilley v. County of Cook* 103 U. S. 155.

In order to convert a proposal into a promise the constituents of the acceptance tendered must comply with and conform to the conditions and exigencies of the proposal. The acceptance must be of that which is proposed and nothing else and must be absolute and unconditional. Whatever the proposal requires to fulfil and effectuate acceptance must be accomplished and the acceptance must include and carry with it whatever undertaking, right or interest the proposal calls for, and there must be an entire agreement between the proposal and acceptance in regard to the subject-matter and extent of interest to be contracted. If the parties do not refer to the same things in the same sense the transaction is simply one of proposals and counter proposals. Pollock's

Principles of Contract ch. 1; Bishop on Contracts ch. 14; 1 Parsons Cont. b. 2 ch. 2 sec. ii.

The transactions relied on as amounting to a contract of sale must be tested by these principles. What would have been the effect if Wagner on June 30th had merely assented to the proposal is a question we are not required to consider. It may be that in that event the transactions would have been too uncertain to create any binding contract relations. Indeed it is probable that the parties failed to see and appreciate the incongruities which would naturally arise from any attempt to apply the scheme as drawn by the proposal, to new objects and interests and changed conditions.

We are to assume however for the purpose of the question which is presented, that a legitimate accession to the offer in accordance with its true sense, would, though given subsequent to material changes of interests and of circumstances, have brought into existence a practicable arrangement and one possessing the mutuality and certainty necessary for a valid contract. The first step is to identify the subject-matter with which the proposal dealt and to which it must be confined. The surrounding circumstances have been noticed. The parties were partners. Each owned an interest and each was accountable for liabilities. In this state of things Eggleston proposes to sell his interest to Wagner for $40,000, on the terms of an assumption by Wagner of all existing liabilities. This is on May 19th. Wagner does not accept, and both concur in pushing on the business and in bringing about substantial changes. Old debts are paid and new ones are made. The items of debt and credit are different and the debtors and creditors cease to be the same. There are variations in respect to the stock and tools and the interests are changed in point of value. On June 9th the parties concur in a much more radical change. Wagner sells out to Eggleston for some $13,000, and by the payment to Wagner of that sum Eggleston increases his interest to the same extent. Eggleston promises that the offer of May 19th shall continue up to July 1st and that subsequent business shall be transacted on that basis. Both

understand that the business is not to be interrupted. Now the offer of May 19th was not an offer to sell future interests, but to sell such as Eggleston then held, and not on the terms of an assumption by Wagner of indefinite and uncertain future liabilities, but of ascertained liabilities then existing. Such was the transaction, and on June 9th the parties agreed that this identical proposal should remain open until July 1st. It is not pretended that any new proposal was made or agreed on. Having given Wagner an option to buy on certain terms such interest as he, Eggleston, held on the 19th of May, it was arranged to prolong such option until the 1st of July. There was no agreement to give time for Wagner to come in and accept an offer of a present or different interest. There was no such offer to be kept open. The writings and the surrounding facts are positive in their meaning that the original proposal applied to no interest except that which was held by Eggleston on May 19th, and that the arrangement allowing it to run until July 1st did not cause it to cover subsequent interests. From the 9th of June this original offer to sell the same interest Eggleston held on May 19th was an offer for every instant until the disagreement of the parties on June 30th, (*Boston & Maine R. R. v. Bartlett* 3 Cush. 225,) but no agreement was made to expand it. Such then was the offer and the only offer which Wagner had before him on June 30th.

Upon the question whether the circumstances relied on as constituting acceptance tallied with this offer or proposal, only a few words are necessary. Wagner tendered $40,000 and offered to assume certain debts and liabilities, and he required Eggleston to execute the deeds and bill of sale. These offers and requirements were put forth and are now urged as amounting to a perfect acceptance. It is needless to inquire whether Mrs. Eggleston's execution of the deeds could be called for, or whether he could be required to give the covenants which were inserted, or whether the covenant offered by Wagner applied to the same debts and liabilities contemplated by the proposal. The deeds and bill of sale together applied certainly to all the property pertaining to

the concern and held by Eggleston on June 30th, and on the admitted facts they covered many thousand dollars of interest beyond the interest to which the proposal applied. The whole interest recently held by Wagner himself and amounting to $13,000 had been added.

Without referring to other points of probable disagreement between the proposal and the alleged acceptance, a clear illustration of the difference under notice is presented, by supposing the money price and the amount of interest to be equivalents; and the fact may then be described by saying that Eggleston offered to sell an interest of $40,000 and Wagner, under the name of acceptance of that offer, insisted upon being granted an interest of $53,000 and no less. The result is that the alleged acceptance was not an acceptance. In substance and effect it was an offer to accept upon terms varying from the proposal, and it produced no contract relation. *Nat. Bank v. Hall*, supra. See also the books on contracts referred to. I am not satisfied that the judge erred in allowing a reference as to the value of the good-will, but no further opinion is called for.

The judgment is reversed with costs, and a new trial ordered.

The other Justices concurred.