GLEN A. GILLASPIE, APPELLANT, V. NEBRASKA TRACTOR & EQUIPMENT COMPANY, A CORPORATION, ET AL., APPELLEES.

122 N. W. 2d 17

Filed June 7, 1963. No. 35357.

Young, Holm, Miller & McEachen, for appellant.

Kennedy, Holland, DeLacy & Svoboda, William P. Mueller, and Robert A. Skochdopole, for appellees.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

MESSMORE, J.

This is an action at law to recover damages for personal injuries sustained by the plaintiff Glen A. Gillaspie when he was struck by a truck driven by defendant

Donald F. McHugh, an employee of the defendant Nebraska Tractor & Equipment Company, a corporation. The trial court directed a verdict in favor of the plaintiff and against the defendants and submitted to the jury solely the question of damages sustained by the plaintiff as a result of the accident. The jury returned a verdict in favor of the plaintiff in the amount of $3,000. The plaintiff filed a motion for new trial which was overruled. Plaintiff appealed to this court.

There is no dispute that the Nebraska Tractor & Equipment Company is a Nebraska corporation; that there existed in the city of Omaha a "Y" intersection where Howard Street, an east-west thoroughfare, is joined by St. Mary's Avenue, a northeast-southwest thoroughfare, at Seventeenth Street, a north-south thoroughfare; that on the west side of the "Y" intersection there is located a safety island which separates Howard Street and St. Mary's Avenue; that prior to August 11, 1958, the city of Omaha had white lines painted on the surface of the street at this intersection to indicate pedestrian crosswalks; that crosswalks on the west side of the intersection lead to and from the safety island separating Howard Street and St. Mary's Avenue; that on August 11, 1958, a truck owned by defendant Nebraska Tractor & Equipment Company and operated by its employee, defendant Donald F. McHugh, within the scope of his employment, in a northerly direction on Seventeenth Street, was making a turn to the left in the intersection; and that while so turning, the truck collided in the intersection with the plaintiff who was a pedestrian.

The plaintiff's petition and the amendment thereto alleged in substance that while crossing the street in a crosswalk, with a green traffic signal in his favor, the plaintiff was struck by a truck owned by the defendant Nebraska Tractor & Equipment Company, and operated by defendant Donald F. McHugh in the course of his employment by said company; that the accident was proximately caused by the negligence of the defendants;

and that as a result of such negligence the plaintiff suffered personal injuries including an acute coronary infarction, medical expense, loss of wages, and permanent disability.

The defendants in their answer denied plaintiff's allegation of injury and damages alleged to have been sustained by him, and alleged that said accident occurred by reason of the plaintiff's own negligence, which negligence was more than slight and contributed to the accident.

Glen A. Gillaspie will be referred to as plaintiff, and the defendant Donald F. McHugh as McHugh.

The plaintiff, at the time of the trial, was executive secretary of the central branch of the Y.M.C.A. in Omaha. He was 59 years of age. On the date of the accident, which occurred at the intersection of Seventeenth Street and St. Mary's Avenue, he proceeded to cross the street to the traffic island and then go from the island across Howard Street to the Y.M.C.A. At the time of the accident he was in the crosswalk. The traffic light was green and in his favor. Before he attempted to cross the street, he glanced to his right and saw a parked car which he thought might make a turn onto St. Mary's Avenue or Howard Street. The driver of the car nodded his head, indicating that the plaintiff could proceed across the street. It was a clear and dry day. As the plaintiff proceeded to cross the street he was looking straight ahead to make sure he would get to the island before the traffic light would turn red. When he was approximately two-thirds of the way across the space between the curb and the island, he noticed an object out of his side vision. He threw up his arm and turned in a general direction to the left, and then the collision occurred. The accident happened so quickly that he did not know how far the truck was from him. He turned instinctively, and was clipped by the rear-view mirror of the truck which came into contact with him. This rear-view mirror extended from the left

gatepost of the truck and hit his right elbow, and the left rear fender struck his right hip. He was thrown to the pavement and rolled over at least once. When he was next conscious of where he was, he was lying face down on the pavement outside of the crosswalk to the left. He got up and looked for the driver of the truck who got out of the truck and came over to him. The right leg of the plaintiff's trousers was torn down the seam.

The plaintiff testified that his elbow gave him severe pain. His concern was that he might have a chipped elbow bone. His hip was quite bruised from the impact of the truck. He experienced a tightness across the general region of his chest. After he left the scene of the accident he went directly to the Y.M.C.A. and contacted his secretary. He told her what had happened and that he would be away from the office until he could get an X-ray taken of his elbow. This X-ray cost $18. He went to Dr. Simonds' office in the Medical Arts Building and had the X-ray taken, and then returned to his office in the Y.M.C.A. The plaintiff further testified that that evening he was pretty well exhausted and had a tightness in his chest which persisted, causing him not to sleep well. He was awakened once or twice that night with pain in his chest. The next morning he lacked energy and wanted to stay in bed, but felt that he should get back to work, which he did. He worked the next 6 or 7 days and was able to do the planning and desk work required of him at that time of the year. During the 8 days following the accident, while he was sitting at his desk or walking around, he would periodically have sharp pains in the center part of his chest and feel that he was being suffocated. The pain in his chest would last from 15 to 20 minutes and then subside. He would have such pains three or four times a day. As to his physical condition during those 7 or 8 days, he would be short of breath and have a tightness in his chest which seemed to persist. How-

ever, he worked normal hours at his office those 8 days. On the morning of August 19, 1958, it was difficult for him to get out of bed. He was listless but went to work, and while sitting at his desk he felt that the room was stuffy, and he began to get severe pains in his chest. He called Dr. McCarthy's office and was told to come to the office. He started to go to Dr. McCarthy's office and got as far as the lobby of the Y.M.C.A. and realized that he could go no farther. He was perspiring profusely and laid down on a bench in the lobby. He was taken to the Bishop Clarkson Memorial Hospital by the rescue squad vehicle and was admitted to the hospital by an intern. He was first given oxygen, and then Dr. McCarthy arrived. At the time the plaintiff arrived at the hospital, his pain was quite severe and was in the center part of his chest. The pain persisted until he was given a sedative to deaden it. He was admonished to lie perfectly still, was given medicine and sedatives from time to time, and an ice pack was placed on his chest each half hour for 3 or 4 days. He was given oxygen constantly. He remained motionless on his back for about a week. He was in pain all the time and had a tightness in his chest. The plaintiff testified that he had never had anything like that prior to the accident, and had never been treated for a heart condition of any sort. He was in the hospital for 5 weeks and then permitted to go home and remain quiet. During the time he was at home he was treated by Dr. McCarthy. In the early part of December he had tightness in his chest and occasional pain. He was told to take nitroglycerin pills and use them when needed, and he took several of such pills. He went back to the hospital December 16, 1958, and was told by Dr. McCarthy that there was a slight recurrence of what he had had, a myocardial infarction. The treatment was about the same as he had previously had. He remained in the hospital for 2 weeks.

The plaintiff returned to his work at the Y.M.C.A. on

February 16, 1959. The first week he worked 2 hours a day; the second week his work was increased to half a day; the third week it was increased to 5 hours a day; and at the end of March he was able to stay at his office the full 8 hours. His salary was $5,800 a year. His duties consisted of supervision of anything that happened with reference to the Y.M.C.A. activities. He was also supervisor of the dormitory. Prior to the accident he would meet with club officers and boards and work with various program groups at night as well as in the daytime. At the time of trial he was responsible for the whole operation of the central branch of the Y.M.C.A. rather than one department of it. This consisted of having department heads report to him on what was happening in their particular departments. Following his heart condition he was unable to physically perform the work he had previously performed in the Y.M.C.A. He was told by his doctor not to get into jobs or situations where he would get excited or which would unduly cause him concern. Before the accident the plaintiff did some square dancing, liked to garden and do yard work, all of which activities are now curtailed. He was unable to take evenings out socially or work to any extent as he did previously on such matters. During the day he becomes tired by noon and regularly goes to the health department and lies down on a cot and sleeps from 30 minutes to an hour. He needs much more sleep than he previously did. Prior to the onset of the heart difficulty, he was a member of a civic club, very active in United Community Services committees, and was a member of committees of his church.

On cross-examination the plaintiff testified that immediately after the accident he had X-rays taken of his elbow, and when he got home he examined his hip because of the soreness he felt in it. The spot on his hip had not turned black and blue, but it was sore to touch. His hip was never discolored. On the morning of August

19, 1958, he had a tightness in his chest which seemed to be worse. He was aware that he needed medical attention, and the pain was excruciating. He perspired profusely, was lightheaded and dizzy, and had difficulty breathing. Later, he became executive secretary of the central branch of the Y.M.C.A., which he considered an advancement, and he received a salary of $6,400 a year beginning in January 1961.

Viola Burton testified that she was the plaintiff's secretary; that from the time of the accident to the time of his hospitalization his color was poor; that he appeared to be more tired from his duties; and that he seemed not to be himself.

Clella McCoy Anderson testified that she worked under the direct supervision of the plaintiff at the Y.M.C.A. at the time of and immediately following the accident, and had daily contact with the plaintiff from the date of the accident, August 11, 1958, to the date of his hospitalization, August 19, 1958. After the accident and until the plaintiff was hospitalized she noticed his physical appearance to be different than it had been prior to the accident. He looked very pale.

Dr. J. D. McCarthy testified that he was a practicing physician specializing in the field of internal medicine; that he had taught medicine at the University of Nebraska School of Medicine for over 30 years; and that he was a professor of internal medicine and senior consultant. His practice is limited to diagnosis and treatment of the heart and lungs. Dr. McCarthy further testified that on March 6, 1958, he gave the plaintiff a complete general physical examination and found that the plaintiff's physical condition was normal in all respects, and found nothing which indicated any heart difficulty. He next saw the plaintiff on August 19, 1958, when he arrived at the hospital. At that time the plaintiff was in a state of extreme collapse. At the hospital the plaintiff gave a history of chest pains he had had since the accident on August 11, 1958. The

doctor found the plaintiff in a critical condition, and deemed it necessary to consult another physician who was interested in heart treatment, because the plaintiff's case was severe. The plaintiff's condition was diagnosed as coronary infarction which was demonstrated by an electrocardiogram. This doctor gave as his opinion that at the time of the accident something happened to the artery of the heart. The coronary infarction started from the time of the accident, occurred at the time of the accident, and became progressive.

Dr. F. Lowell Dunn, a specialist in internal medicine which includes treatment and diagnosis of heart problems, heart diseases, or any troubles that occur in the heart, testified that he saw the plaintiff for the first time on November 19, 1959, and made a careful history, gave the plaintiff a physical examination, and did some laboratory work relative to the plaintiff's condition. He diagnosed the plaintiff's ailment as a heart infarction. This doctor stated that in his opinion the accident was the direct cause of the heart injury and the following heart damage. He further testified that the plaintiff had not collapsed prior to August 19, 1958, because the injury and damage caused to the heart by the trauma was progressing. This doctor's opinion was that the infarction had commenced within hours after the accident, as a result of the trauma, and the collapse of the plaintiff 8 days later occurred because of the increase in the size of the infarct which had gradually developed in that period. On cross-examination this doctor stated in his report that the plaintiff suffered a coronary thrombosis, which means an occlusion of a blood vessel; and that if he was writing his report over again he would have preferred to have used the word "infarction" because it was a more vague term.

It was stipulated that as a result of the heart disorder for which the plaintiff was hospitalized on August 19, 1958, the plaintiff incurred expenses for hospitalization, ambulance service, laboratory fees, electrocardio-

grams, special nursing services, doctors, and drugs in the amount of $3,086.37.

The undisputed salary of the plaintiff at the time of the accident was $5,800 a year. Plaintiff claims he sustained, during his illness and convalescence, the following loss of wages: From August 19, 1958, to February 15, 1959, total disability, at $483.33 a month, total $2,848.50; and from February 16, 1959, to March 3, 1959, half time (actual resumption of full time did not occur until end of March 1959) $120; total $2,968.50.

McHugh testified that as he was approaching the intersection of Seventeenth Street and St. Mary's Avenue, the traffic light was red for northbound traffic; that he was in the left or outside lane of traffic; that there was another car to his left at the corner of Seventeenth Street and St. Mary's Avenue in the parking lane; that this car was not moving when he first noticed it, and as the light turned green for northbound traffic this car proceeded to make a left turn and this witness proceeded on to make a more sweeping or wider turn onto Howard Street; and that the car that made the left turn on Howard Street was between this witness and the corner of Seventeenth Street and St. Mary's Avenue where the pedestrians (plaintiff) would have stood. As this witness started his turn and was making a slight turn he saw the plaintiff at that moment. The plaintiff threw up his arm about the same time he was hit by the truck. This witness further testified that at the time of impact he was driving his truck at a rate of speed of from 5 to 10 miles an hour. After the impact when the truck was stopped, the plaintiff was 2 or 3 feet from the truck.

Dr. Maurice E. Stoner testified that he was a specialist in internal medicine, which includes the diagnosis of heart troubles. This doctor confines his practice to internal medicine entirely, with a special interest in the diseases of the heart and chest. He examined the plaintiff on March 29, 1961. In the course of his examination

he took a history from the plaintiff of the accident which the plaintiff had and all matters pertaining thereto, and the plaintiff's condition before and after the accident. He studied X-rays taken of the plaintiff in Bishop Clarkson Memorial Hospital, and electrocardiograms taken of the plaintiff at the hospital. He testified that an exhibit, which was an enlargement of an electrocardiogram taken of the plaintiff and admitted in evidence, portrayed a hyperacute infarction which is early in the course of the myocardial infarction. This represents an area that is occluded, which means the same as plugged. He further testified that infarction is that process which occurs beyond the point of occlusion. At first the infarcted area has no circulation and is merely injured, but if the blood supply is continually occluded, then tissue death occurs. From an examination of the exhibit the doctor gave his opinion that the infarction of the plaintiff's heart occurred within a few hours prior to the time the electrocardiogram was taken on August 19, 1958. Basing his opinion on the hospital records and his medical knowledge and experience, he testified that the plaintiff's heart infarction was a sudden event which occurred on August 19, 1958, and it was not preceded by any other condition. Based upon a reasonable degree of medical certainty and a complete study of all the records of the hospital available to him, this doctor found no causal connection between the trauma of August 11, 1958, and the infarction of August 19, 1958. He testified that there are no known precipitating factors in coronary occlusion or coronary thrombosis.

On cross-examination this doctor stated that in his opinion, without physical and laboratory examinations during the period between August 11, 1958, and the plaintiff's collapse on August 19, 1958, any causal connection would be conjectural and open to question.

The principal assignments of error set forth by the plaintiff to be determined on this appeal are as follows:

The verdict of the jury is a compromise verdict and does not represent separate decisions by the jury on the issues of whether the defendants were liable for damages resulting from the coronary infarction; that the amount of damages returned by the jury in behalf of the plaintiff represents a compromise on the issues involved; and that the verdict of the jury is contrary to the law and the evidence.

In its consideration of the question of damages the jury had before it two separate classes of injuries, or two elements to be considered, alleged by the plaintiff to have been caused as the result of the accident: (1) The injuries which occurred on August 11, 1958, the date of the accident, that is, injuries to the plaintiff's right elbow and right hip and the shock occasioned by the accident as a result of injuries, and the $18 X-ray bill for the plaintiff's elbow; and (2) the coronary infarction which plaintiff claimed resulted as a direct and proximate result of the accident and which occurred on August 19, 1958, resulting in hospital, medical, doctor, and nurses expenses of $3,086.37, and a claim of the plaintiff that he had a loss of wages in the amount of $2,968.50. Consequently, when the case was submitted to the jury for its deliberation, the following alternatives were presented: (1) To determine the extent and nature of the injury to the plaintiff's right elbow and hip and shock which occurred to the plaintiff as a result of the accident of August 11, 1958, and to assess the amount of damages which would fairly and reasonably compensate the plaintiff for such injuries; (2) to consider and determine whether or not the coronary infarction which occurred on August 19, 1958, and the expense resulting therefrom were proximately caused by the accident of August 11, 1958; and (3) in the event the jury determined that the plaintiff failed to prove a causal connection between the accident of August 11, 1958, and the coronary infarction which occurred on August 19, 1958, it would then proceed to assess the

amount of damages for the injury sustained by the plaintiff on August 11, 1958, with no allowances for the $3,086.37 hospital, medical, doctor, and nurses expense or for wages due to the loss of time, or for any pain or suffering or disability to which plaintiff testified, as a result of his heart condition. However, in the event the jury determined there was a causal connection between the accident of August 11, 1958, and the coronary infarction suffered by the plaintiff on August 19, 1958, it would then proceed to assess the amount of damages for the injuries sustained by the plaintiff, the medical expenses, loss of time and wages, and also pain and suffering or disability suffered by the plaintiff as the jury would deem to be a fair and reasonable recovery for the same.

While it is true that Dr. Maurice E. Stoner testified that the plaintiff, in giving his history to the doctor, stated that his hip remained painful for nearly a year when he was lying on it, the plaintiff did not testify to any such pain to his hip. There is no indication in the record that the plaintiff lost sleep or had any difficulty by reason of injury to his hip, neither did the injury to the plaintiff's hip or elbow cause the plaintiff any pain or discomfort, perhaps, except for a few days after the accident. The plaintiff expended $18 for an X-ray of his elbow which revealed no fracture. The history given to Dr. Stoner was the only history upon which the doctor could testify as to his opinion. This type of evidence is hearsay evidence and cannot be considered.

Hearsay evidence is defined as follows: "A term applied to that species of testimony given by a witness who relates, not what he knows personally, but what others have told him, or what he has heard said by others." Black's Law Dictionary (3d ed.), p. 882. See, also, Hopt v. Utah, 110 U. S. 574, 4 S. Ct. 202, 28 L. Ed. 262; Morell v. Morell, 157 Ind. 179, 60 N. E. 1092.

The only evidence of injury or damage other than that

caused by the coronary infarction was the injury received by the plaintiff to his elbow and hip at the time of the accident, which necessitated an X-ray of the elbow on the date of the accident. It is obvious from a review of the evidence, if the jury considered the coronary infarction, the verdict was inadequate because, as a result of the coronary infarction the plaintiff incurred expenses stipulated to be of the reasonable value of $3,086.37 which alone was more than the verdict returned by the jury, and in addition loss of time and wages claimed by the plaintiff of the reasonable value of $2,968.50, making a total of $6,054.87 of special damages, in addition to permanent disability, pain, and suffering.

Under the alternatives submitted to the jury, heretofore mentioned, the verdict did not represent a conscientious finding by the jury of damages under such alternatives. It was a compromise verdict, because under alternative No. 1, the verdict was entirely too large, and under alternative No. 2, obviously it was too small a verdict.

There are many cases relating to the subject matter of compromise verdicts. It would unnecessarily lengthen this opinion to cite and quote from all of such cases. We deem the following to be applicable to the instant case on the principle involved here.

In Meyer v. Shamp, 51 Neb. 424, 71 N. W. 57, there was a partnership engaged in selling agricultural implements and machinery. The partnership had become indebted to certain creditors. An interest in the partnership was sold, and the purchaser agreed to assume and pay certain liabilities of the partnership and to save the defendant in error harmless therefrom. The defendant in error was forced to pay the debts and the sums so paid were not paid by the former purchasers of the partnership interest. The debts consisted of different amounts. The least amount of such debts was $18. The jury returned a verdict in the amount of $1. Motion for new trial was filed and sustained. This court said:

"There is no conceivable condition which the evidence could have assumed and a verdict be rendered on this issue, other than by a compromise or disregard of the amount shown to be due, and be for such sum as was this one. * * * It was clear that the jury must have arrived at the verdict rendered by a compromise, or by disregarding the evidence and sustituting for what was thereby shown its own idea or estimate of what would be about justice and right between the parties litigant." This court cited 2 Thompson on Trials, § 2606, as follows: " 'Where the verdict which the jury returns cannot be justified upon any hypothesis presented by the evidence, it ought obviously to be set aside.' " The court held: "Where it is clear that a verdict of a jury is based on a compromise of the differences of opinion of its individual members, and in disregard of the evidence, it is not error to set it aside."

The leading case on this subject appears to be Simmons v. Fish, 210 Mass. 563, 97 N. E. 102, Ann. Cas. 1912D 588. This was a case to recover for the loss of an eye. The jury returned a verdict for $200. On a motion for a new trial, it was claimed that the verdict amounted to a verdict for the defendant, and as shown by the amount for the plaintiff, was a compromise verdict. It was argued that this was a compromise verdict, where certain jurors must have conceded their conscientious belief that the defendant ought to prevail to the end that an agreement might be reached. Chief Justice Rugg speaking for the court said: "In order to pass upon the soundness of this argument, it becomes necessary to inquire what a compromise verdict is, and to ascertain whether this was such a verdict. It was said by Cooley, J., in Goodsell v. Seeley, 46 Mich. 623, at 628, 'It is no doubt true that juries often compromise . . . and that "by splitting differences" they sometimes return verdicts with which the judgment of no one of them is satisfied. But this is an abuse. The law contemplates that they shall, by their discussions, harmonize

their views if possible, but not that they shall compromise, divide and yield for the mere purpose of an agreement. The sentiment or notion which permits this tends to bring jury trial into discredit and to convert it into a lottery.' See also Meyer v. Shamp, 51 Neb. 424, 430. * * * The jury room cannot be entered in order to ascertain what has transpired there. Its deliberations are in secret, and ordinarily cannot be made the subject of testimony by jurors. Woodward v. Leavitt, 107 Mass. 453. What went on there may be learned by other sources. Wright v. Abbott, 160 Mass. 395. It is not infrequently possible to determine with some approximation to accuracy what went on there from the result produced. This is such a case. * * * It seems plain from the record that this was a compromise verdict. * * * It is inconceivable that any jury, having agreed upon the issue of liability, should have reached such a determination as to damages."

In Parizo v. Wilson, 101 Vt. 514, 144 A. 856, it is said: "Where, from the inadequacy of the damages awarded in view of the evidence on the subject and the conflict of the evidence upon the question of liability, or from other circumstances, the plain inference may be drawn that the verdict is the result of a compromise, the error taints the entire verdict, and a new trial should be ordered upon all issues." See, also, Farr v. Fisher, 107 Vt. 331, 178 A. 883, 98 A. L. R. 926.

In Riley v. Tsagarakis, 53 R. I. 261, 165 A. 780, the court said: "Where the court is convinced that a verdict was the result of a compromise on the questions of liability and damages, and the award of damages is inadequate, exception of defendant to refusal of court to grant new trial on all the issues of the case will be sustained." This was an action of trespass on the case for negligence to recover damages for the death of plaintiff's husband caused by the alleged negligence of defendants' servant. The verdict was for $5,000. The deceased was 55 years of age when he was struck and killed by

the defendants' truck. His life expectancy was 17.58 years. After deducting his expenses for each year, the deceased had a net annual surplus of $1,031.16. In view of his life expectancy of 17.58 years, the amount of damages computed by the established rules of law would be about $11,000. The court said: "Upon consideration of the evidence and the award of damages made by the jury, we are convinced that this verdict was the result of a compromise on the questions of liability and damages." See, also, Schuerholz v. Roach, 58 F. 2d 32; Southern Ry. Co. v. Madden, 235 F. 2d 198. There are many other cases to the same effect as those above cited.

Other matters raised by the plaintiff need not be determined.

For the reasons given in this opinion, we conclude that the judgment of the district court should be reversed and the cause remanded for a new trial.

REVERSED AND REMANDED.